**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **RUSSELL SMITH** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No.: **PJM 08-3302** |
| | * | |
| **DAVID MATHIS, et al.** | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM OPINION**

Russell Smith, an inmate at the Eastern Correctional Institution ("ECI") in Westover, Maryland, has sued Dr. David Mathis, Maryam Messforosh, Nancy Bealer, and Correctional Medical Services, Inc. (collectively "Defendants") under 42 U.S.C. § 1983 for denial of adequate care and deliberate indifferent to his serious medical needs. Correctional Medical Services, Inc. ("CMS"), is the private health care provider for ECI under a contract with the State of Maryland. Defendants have filed a Motion for Summary Judgment [Paper No. 96]. For the following reasons, the Motion is **GRANTED**.

**I.**

Smith has been incarcerated at ECI since 1991. In late January 2008, Smith, who is left-handed, suffered an injury to his right arm while playing basketball. Smith has stated that he experienced and continues to experience constant pain from his shoulder through his fingers and numbness in his right hand. Prior to the injury, he was actively involved in weight lifting. He worked out approximately five times per week, and in his opinion, was a "top" member of a prison power lifting team.

1

As a result of his injury, Smith submitted sick call requests on February 5, 2008 and February 10, 2008, complaining of a "torn muscle" in his arm.  Nurse Meredith Rathkamp evaluated him on February 13, 2008 and noted a hardened area between Smith's shoulder and bicep muscle as well as an area of depleted muscle mass.  Rathkamp referred Smith to a physician's assistant for further evaluation.

On February 19, 2008, physician's assistant Messforosh and Dr. Mathis, then Medical Director at ECI, examined Smith.  At the examination, Smith complained of increased pain in his arm and stated that he had difficulty contracting his bicep muscle.  Messforosh and Dr. Mathis concluded that Smith most likely had a "rupture of the tendon of the bice[p]," resulting in loss of function of the muscle and "retraction of the belly of the muscle," which "created a bulge and deformity."  According to their notes, Smith denied having any paresthesia (numbness/tingling) in his arm.  No need for an x-ray or other diagnostic tests was indicated.  Smith was prescribed ibuprofen through March 20, 2011, and a follow-up evaluation was noted for four weeks.

 On April 11, 2008, Smith saw physician's assistant Bruce Ford to obtain medication for unrelated skin problems.  Ford conducted a general physical exam of Smith and found no sensory, motor or focal deficits and no "acute distress."

On April 26, 2008, Smith submitted another sick call request, complaining that he had a "torn bicep" and needed "something for the pain."  A nurse saw Smith three days later and gave him ibuprofen.  Ibuprofen and other pain medications were available at the ECI commissary.  The nurse noted that she would discuss Smith's situation with Messforosh.

On August 15, 2008, Dr. Mathis again examined Smith.  Dr. Mathis noted that Smith was "unhappy" with his "ability to lift weights" and experienced "discomfort in his right shoulder when he pu[t] his arm above his head at night to sleep."  Dr. Mathis noted further that Smith said he could do pushups although it caused some discomfort at his shoulder.  Dr. Mathis conducted

tests and determined that Smith's right shoulder and elbow had full range of motion.  Dr. Mathis

wrote that he found "no tenderness at the acromion or coracoid" (parts of the shoulder).

Similarly, Dr. Mathis reported that there was "no tenderness of the remaining biceps tendon."  In

his assessment, Dr. Mathis stated:

> His [Smith's] arm is fully functional although not to the degree that he feels is competent
> in the Power Lifting contingent at ECI.  He is also concerned re: being able to protect
> himself in the prison environment if he is involved in a fight.  There is no evidence from
> his exam or medical history that there is any detriment to normal ADL's [activities of
> daily life].

Dr. Mathis later stated that Smith had a ruptured bicipital tendon and did not have any injury to

his right shoulder.  Dr. Mathis relied on his training and experience as a board certified physician

in making the diagnosis.

Contrary to the notes Dr. Mathis made during his examination and his later testimony,

Smith declared during his deposition that Dr. Mathis had in fact told him he needed surgery.

Smith alleged that Dr. Mathis said surgery was "the only thing that would repair the injury."

According to Smith, Dr. Mathis explained that he would file the necessary forms for an

orthopedic consultation.

Dr. Mathis agreed that he had submitted paperwork for an outside orthopedic

consultation, though he testified that at the time he did not think the consultation would be

beneficial.  Accordingly, Dr. Mathis sent his paperwork to Wexford Health Sources, Inc.

("Wexford"), a company employed by the State to make all determinations regarding medical

evaluations outside of ECI.  Wexford declined the request as not medically indicated.[1]

On September 29, 2008, Smith initiated an administrative review procedure with the

Warden's Office concerning the medical treatment he had received for his right arm.  Nancy

Bealer, the Assistant Director of Nursing at ECI, met with Smith and reviewed the paperwork.

---

[1] Smith has not named Wexford as a Defendant in this action.

Bealer concluded that Smith was receiving appropriate care for his injury.  Smith, however, avers that during their meeting Bealer informed him that since he could bend his arm, he had been given adequate care.  Based on Bealer's findings, the Warden dismissed Smith's complaint.

Approximately two years later, on October 18, 2010, Dr. Mathis submitted a second request for an orthopedic consultation to Wexford.  The request was based on the same issues Dr. Mathis had recorded when he examined Smith in August 2008—Smith was unhappy with his ability to lift weights and experienced discomfort when he put his right arm above his head at night to sleep.  Wexford again denied the request, finding that Smith was able to function in the routine activities of daily life.  On his consultation form, Dr. Mathis wrote that Smith's "pain" had not been an issue, and if there was a change in Smith's condition, he would raise it with the doctor who oversaw outside evaluations.

After Smith instituted this litigation, he enlisted the expert services of Dr. Charles Stegman.  Dr. Stegman examined Smith on June 30, 2011 and confirmed the diagnosis of a ruptured right bicep tendon.  The injury caused weakness and muscle atrophy in his right bicep. Dr. Stegman noted that, by comparison, Smith's shoulder muscles and forearm showed no signs of atrophy.  Dr. Stegman wrote that Smith found it difficult to lie on his right shoulder or lift his arm overhead or in a throwing motion.  He described Smith's other complaints as "more subjective in nature."  Dr. Stegman did not see any evidence of muscle fasciculation during the exam.  Smith's claim that he felt numbness and generalized weakness in his right hand and forearm could not be confirmed without nerve conduction studies.  As for Smith's shoulder pain, Dr. Stegman noted that rotator cuff injuries "sometimes" accompany a bicep tendon rupture and might explain the alleged pain.  Dr. Stegman made clear that, contrary to Smith's opinion that he should have undergone immediate surgery for the injury, a "biceps tendon rupture is usually treated non-surgically, even when addressed immediately."  Dr. Stegman recommended passive

range of motion exercises to Smith.  As of July 11, 2011, Smith had not done any of the exercises.

Despite the injury, Smith testified that he was still able to clean his cell, dress and undress, bathe, get in and out of bed, walk unassisted, feed himself, and attend to his personal hygiene without assistance.  Smith has not been assaulted or otherwise hurt since he injured his right bicep.[2]  Smith works as a teacher's aide in the ECI education department, assisting other inmates with reading, writing, and math.  He indicates that he is able to type on a computer with both hands and maneuver the mouse with his right hand.

## II.

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court, however, must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v.*

---

[2] According to Smith, he was assaulted on two previous occasions—in 1992, he was stabbed several times by another inmate, for which he received medical treatment, and in 2007, was hit in the face during a basketball game, for which no medical treatment was needed.

*Catrett*, 477 U.S. 317, 323-24 (1986)).  Summary judgment is appropriate where a party fails to

make a showing sufficient to establish the elements essential to the party's claim and on which

the party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  There must be sufficient evidence for a reasonable jury to find for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986), and a "mere scintilla of proof . .

. will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir.

2003).

### III.

### A.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment,'" and "states

a cause of action under § 1983."  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citation

omitted).  To establish a valid claim, a prisoner must prove: "(1) that objectively the deprivation

of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials

acted with a sufficiently culpable state of mind.'"  *Johnson v. Quinones*, 145 F.3d 164, 167 (4th

Cir. 1998) (citations omitted).  With respect to the first element, a medical need is "serious" if it

"'one that has been diagnosed by a physician as mandating treatment or one that is so obvious

that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko v.

Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846

(7th Cir. 1999)).  The second, subjective element is satisfied by showing deliberate indifference,

i.e. that the prison officials knew of and disregarded "an excessive risk" to the plaintiff's health

or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The prison officials must have had

actual knowledge of the serious risk of harm and also recognized that their actions were

6

Case 8:08-cv-03302-PJM   Document 109   Filed 01/26/12   Page 7 of 11

insufficient to mitigate the risk of harm arising from the plaintiff's medical needs. *Iko*, 535 F.3d at 241 (citations omitted).

It follows that mere negligence or malpractice on the part of prison officials does not violate the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Officials who "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent" cannot be held liable. *Farmer*, 511 U.S. at 844. Officials who actually knew of a substantial risk to an inmate's health and responded reasonably to that risk, even if the harm ultimately was not averted, also cannot be held liable. *Id.*; *see also Bennett v. Reed*, 534 F. Supp. 83, 87 (E.D.N.C. 1981), *aff'd*, 676 F.2d 690 (4th Cir. 1982) (noting that when "it appears from the entire record that the prison medical authorities have made a sincere and reasonable effort to handle plaintiff's medical problems, plaintiff's constitutional rights have not been violated pursuant to 42 U.S.C. § 1983"). Indeed, the medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citation omitted).

## B.

The principles of respondeat superior do not apply to § 1983 claims brought against private corporations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003). Private corporations "can only be held liable under § 1983 if 'an official policy or custom of the corporation causes the alleged deprivation of federal rights.'" *Rodriguez*, 338 F.3d at 355 (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)). In this case, Smith has not alleged or adduced any

7

evidence to show that an official policy or custom of CMS caused the alleged Eighth

Amendment violations.  Accordingly, the Court will grant summary judgment in favor of CMS.

### C.

Turning to the remaining Defendants, the Court finds that they are also entitled to

summary judgment.  There are no genuine disputes of material facts, and Smith cannot show that

the Defendants were deliberately indifferent to his serious medical needs.  Even assuming that

Smith's injury was sufficiently serious to satisfy the first prong of his § 1983 claim, he cannot

prove that Dr. Mathis, physician's assistant Messforosh, and Ms. Bealer acted with deliberate

indifference—i.e. that they knew of and consciously disregarded an excessive risk to his health

or safety.

Indisputably, Defendants responded in a timely fashion to Smith's initial and subsequent

sick call requests.  Nurse Rathkamp saw him about a week after his first request and a couple of

days after his second request.  She conducted a physical examination and referred Smith to a

physician's assistant for further evaluation.  Six days later, Messforosh and Dr. Mathis examined

him.  When Smith submitted another sick call request in late April 2008, a nurse saw him three

days later and gave him ibuprofen.  Dr. Mathis again evaluated Smith in mid-August.  *Cf. Hunt

v. Sandhir, M.D.*, F. App. 584, 586 (4th Cir. 2008) (per curiam) (recognizing that deliberate

indifference can be shown where medical treatment is delayed for non-medical reasons).

It admits of no doubt: The care Defendants provided Smith does not evince deliberate

indifference to a serious risk of harm.  On February 19, 2008, Dr. Mathis and Messforosh

concluded that Smith had a "rupture of the tendon of the bice[p]" in his right arm, a diagnosis

that was confirmed by Smith's medical expert, Dr. Stegman.  Defendants took a conservative

approach to Smith's injury, prescribing pain medication and checking on his recovery.  During

his August 2008 examination of Smith, Dr. Mathis found on the basis of his training and

experience that Smith was not in any serious distress.  Although Smith complained about his ability to lift weights and do pushups and the discomfort he experienced when he put his arm above his head at night to sleep, Smith's right arm and elbow had full range of motion and there was no tenderness "of the remaining biceps tendon" or at his shoulder.  Dr. Mathis reported that there was "no evidence from his exam or medical history that there [was] any detriment to normal [activities of daily life]."  The two orthopedic consultation requests that Dr. Mathis later submitted to Wexford were denied as not medically indicated.  On the second request, Dr. Mathis noted that if Smith's condition changed, he would raise it with the physician who oversaw outside evaluations.  Smith himself testified that the injury affected his non-dominant hand and that he could perform everyday activities, such as cleaning his cell, getting dressed, walking unassisted, feeding himself, and attending to personal hygiene.  Smith, moreover, is able to work as a teacher's aide in the ECI education department and use a computer without difficulty.  Finally, there is no evidence that the torn bicep tendon has endangered Smith due to his inability to defendant himself.  Smith has not been assaulted since the injury.

Smith complains that Defendants should have conducted diagnostic tests and sent him to a specialist or to a surgical consultation given the symptoms he described.  His argument, however, goes to Defendants' medical judgment, not their deliberate indifference.  It is well established that a prisoner's difference of opinion about the correct course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances, and no such circumstances are present here.  *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citation omitted).  Defendants correctly diagnosed Smith with a ruptured right bicep tendon, and as Smith's medical expert conceded, a "biceps tendon rupture is usually treated non-surgically, even when addressed immediately."  After examining Smith, Defendants determined that x-rays and other diagnostic tests were not needed.  *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.

1995) (whether defendant "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability).  Defendants, moreover, filed the paperwork needed for Smith to obtain an outside orthopedic consultation.  Those requests went to Wexford, a party not subject to this suit, which denied them as not medically indicated.

Even if, as Smith claims, Dr. Mathis told him on August 15, 2008 that surgery was "the only thing that would repair the injury," Defendants are still entitled to summary judgment.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Dr. Mathis's statement on that particular day does not cast doubt on the extensive evidence Defendants submitted showing that Smith obtained treatment and could perform normal daily activities without assistance.  Furthermore, Dr. Mathis did submit the orthopedic consultation requests on Smith's behalf.  The fact that they were denied by Wexford does not transform Defendants' conduct into deliberate indifference.  A jury could not, based on Dr. Mathis's alleged statement, establish liability of the Defendants in this case.

At most, Smith raises the question of whether Defendants may have been negligent and should have done more to treat his injury.  Even if his position were taken, a highly doubtful proposition, malpractice is not enough to establish an Eighth Amendment violation.   In sum, Smith has failed to show that Defendants had actual knowledge of a serious risk of harm posed by his ruptured bicep tendon or that they recognized that their actions were insufficient to reduce the risk.  Because Smith cannot prove the subjective prong of his § 1983 claim, the Court will grant summary judgment in favor of Dr. Mathis, physician's assistant Messforosh, and Ms. Bealer.

**V.**

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [Paper No. 96].  Final Judgment will be entered in favor of Defendants and the case will be **CLOSED**.

A separate Order will **ISSUE**.


_____/s/ _____

**PETER J. MESSITTE**

**January 24, 2012**                                      **UNITED STATES DISTRICT JUDGE**